FILED

2014 JUN -5 P 3: 48

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| In re UNITED STATES' APPLICATION FOR A SEARCH WARRANT | ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 14-MJ-70430 N<br><br>ORDER |
|---|---|---|

I hereby certify that the annexed
instrument is a true and correct copy
of the original on file in my office.
ATTEST·
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By _____
Deputy Clerk
Date 2/23/15

At the government's request, and for good cause shown, the Court initially sealed the record in the above-captioned matter. The government represents that there is no longer a reason to keep the record sealed. Accordingly, the Court hereby orders that the record in the above-captioned matter be unsealed.

IT IS SO ORDERED.

Dated: June 4, 2014

_____
HON. NATHANAEL COUSINS
United States Magistrate Judge

GOV'T REQ. TO UNSEAL

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  FRANK J. RIEBLI (CABN 221152)
   Assistant United States Attorney
5      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
6      Telephone: (415) 436-7200
       FAX: (415) 436-7234
7      Frank.Riebli@usdoj.gov

8  Attorneys for Plaintiff

9

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

                   SAN FRANCISCO DIVISION
12

13  In re UNITED STATES' APPLICATION    )   CASE NO. 14-MJ-70430 NC
    FOR A SEARCH WARRANT                )
14                                      )
                                        )
15                                      )
                                        )   GOVERNMENT'S REQUEST TO UNSEAL
16                                      )
                                        )
17                                      )
                                        )
18  _____)

19       The government initially requested to seal the records in the above-captioned matters because

20  they were part of an ongoing investigation and immediate disclosure would have jeopardized the

21  investigation and the safety of the individuals involved in it.  The government now has made arrests and

22  must provide discovery to the defendants.  For that reason, the government asks that the Court unseal the

23  records in the above-captioned cases to facilitate discovery.

24  DATED: June 3, 2014                      Respectfully submitted,

25                                           MELINDA HAAG
                                             United States Attorney
26

27                                           _____
                                             FRANK J. RIEBLI
28                                           Assistant United States Attorney

GOV'T REQ. TO UNSEAL

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  FRANK J. RIEBLI (CABN 221152)
   Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
7       FAX: (415) 436-7234
        Frank.Riebli@usdoj.gov
8
   Attorneys for Defendants
9

10             UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

14  IN THE MATTER OF THE UNITED STATES'   )  CASE NO.   3  14   7 0 4 3 0
    APPLICATION FOR A WARRANT TO          )
15  SEARCH 352 SUMMIT AVENUE IN SAN       )  MOTION TO SEAL AND
    RAFAEL, CALIFORNIA 94901              )  [PROPOSED]
16                                        )  SEALING ORDER
                                          )
17                                        )
                                          )
18  _____ )

19         The United States respectfully moves this Court to seal this Motion, any Order ruling on this

20  Motion, the United States' Application and Affidavit in Support of Application for a Search Warrant and

21  attachments, the Order Granting the United States' Application, the Warrant thereon, and any other

22  related paperwork in the above-referenced matter until further Order of this Court. The United States

23  seeks this sealing order to avoid revealing an ongoing criminal investigation, avoid the targets fleeing

24  the district, and ensure the safety of agents and others.

25         The United States also requests that, notwithstanding any sealing order, the Clerk of the Court be

26  required to give copies of the sealed documents to employees of the United States Attorney's Office,

27  and that they be permitted to serve working copies on Special Agents and other investigative and law

28  enforcement officers of the FBI, federally deputized state and local law enforcement officers, and other

SEALING ORDER

1 | government and contract personnel acting under the supervision of such investigative or law

2 | enforcement officers, as necessary to effectuate the Court's Order.

3 | DATED: March 21, 2014                 Respectfully submitted,

4 |                                       MELINDA HAAG
                                          United States Attorney

5 |

6 |

7 |                                       FRANK J. RIEBLI
                                          Assistant United States Attorney

8 |

9 |

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN FRANCISCO DIVISION

11

| | | |
|---|---|---|
| 12 | IN THE MATTER OF THE UNITED STATES' APPLICATION TO SEARCH 352 SUMMIT AVENUE IN SAN RAFAEL, CALIFORNIA 94901 | ) ) ) ) ) ) ) ) ) ) ) |

13

CASE NO.

[PROPOSED]
SEALING ORDER

14

15

~~SEAL~~

16

17     FOR GOOD CAUSE SHOWN, it is hereby ordered that the Motion to Seal, this Order, the

18  United States' Application and Affidavit in Support of Application for a Search Warrant and

19  attachments, the Order Granting the United States' Application, the Warrant thereon, and all other

20  related paperwork in the above-referenced matter be filed under seal until further Order of this Court.

21  Endorsed filed copies shall be provided to the United States Attorney's Office and the FBI, and they

22  shall be permitted to serve working copies on Special Agents and other investigative and law

23  enforcement officers of FBI, federally deputized state and local law enforcement officers, and other

24  government and contract personnel acting under the supervision of such investigative or law

25  enforcement officers, as necessary to effectuate the Court's Order.

26  IT IS SO ORDERED.

27  Dated: March 20, 2014

28                                         HON. NATHANAEL COUSINS
                                           United States Magistrate Judge

SEALING ORDER

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

Case No.

3 14 70430

NC

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

352 Summit Avenue in San Rafael, California 94901

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
352 Summit Avenue in San Rafael, California 94901, described more particularly in Attachment A.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachments B and C

Approved as to form: _____ AUSA Frank Riebli)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371, 1341, 1343, 1956, 1957 | Conspiracy, mail and wire fraud, money laundering, transactions involving criminally derived property |
| 21 U.S.C. 841, 846 | Distribution, possession w/ intent to distribute & conspiracy to distribute marijuana |

The application is based on these facts:

Please see attached affidavit of FBI Special Agent Owen Cunningham

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent Owen Cunningham
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/24/2014

_____
*Judge's signature*

City and state:  San Francisco, CA

Honorable Nathanael Cousins, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Owen Cunningham, a Special Agent (SA) of the Federal Bureau of Investigation
(FBI), United States Department of Justice, being duly sworn, depose and state the following:

### BACKGROUND

1.      I am an investigative or law enforcement officer of the United States within the
meaning of Section 2510(7) of Title 18, United States Code, and I am empowered by law to
conduct investigations of and to make arrests for the offenses enumerated in Title 18, United
States Code, Section 2516.

2.      I have been employed as a SA of the FBI for the past six years.  I am currently
assigned to a squad responsible for the investigation of drug trafficking and violent street gangs.
Through my training and experience, I am familiar with the debriefing of cooperating witnesses
and/or other sources of information and methods of searching locations where illegal drugs,
firearms, instruments of money laundering, and evidence of other crimes may be found.  I have
been trained in and have extensive experience conducting surveillance of drug traffickers.  I am
also familiar with the methods used to import illegal drugs and the methods drug traffickers use
to pay for illegal drugs and conceal the proceeds of their illegal activity.  I have also interviewed
numerous persons involved in illegal weapons and drug offenses.

3.      I have, through training and experience, become familiar with and utilized all
normal methods of investigation including, but not limited to, visual surveillance, interviewing
witnesses, the use of search and arrest warrants, the use of confidential sources, the use of pen
registers, the utilization of undercover agents and the use of court authorized wiretaps.  I am also
familiar with methods of searching locations where narcotics and/or narcotic proceeds may be
found.  I have been involved in multiple drug investigations and have been involved in the arrest

of numerous individuals for narcotics related crimes.

4.      This affidavit is not intended to be a complete and detailed description of all of the facts and evidence discovered during this investigation.  I have set forth only the information I believe is necessary to establish the required foundation for the issuance of the search warrants requested.

5.      Information in this affidavit is based upon my own investigation and that of other experienced law enforcement investigators with whom I am working.  As part of the investigation described in this affidavit, I have reviewed public records and talked with or reviewed reports of other law enforcement investigators.

6.      This affidavit contains information provided by confidential law enforcement sources.  These sources may be referred to in the masculine form.  This reference is for convenience, and is not necessarily an identification of the true gender of any source.

## LOCATION TO BE SEARCHED

7.      This affidavit is submitted in support of an application for the issuance of a search warrant for the following location (the "**Target Location**"):

> **Target Location**:  A single family residence located at 352 Summit Avenue in San Rafael, California, 94901, described in further detail in Attachment A.

8.      It is my opinion and the opinion of the experienced and trained drug investigators with whom I have worked on this case that the facts in this affidavit establish probable cause to believe that there are currently items at the **Target Location** that are evidence of conspiracy, as prohibited by Title 18, United States Code, Sections 371 (conspiracy) 1341 (mail fraud) 1343 (wire fraud) 1956 (money laundering) and 1957 (monetary transactions in criminally derived property); and drug trafficking as prohibited by Title 21, United States Code, Sections 841 and

2

846.  Those items are more particularly described in Attachment B, which is incorporated by reference and made a part of this affidavit.

## PROBABLE CAUSE

8.      I am a member of a team of law enforcement officers that is investigating the illegal activities of David Corey BRECKER and his associates.  This investigation has established that for at least the past four years, BRECKER has been involved in the acquisition of large quantities of marijuana in California and the distribution of that marijuana to a loosely-knit organization of marijuana dealers in the St. Louis metropolitan area.  BRECKER uses the proceeds of his illegal marijuana distribution to maintain the **Target Location**.

9.      In 1998, BRECKER was convicted of burglary and felony theft in Maricopa County (Phoenix), Arizona and sentenced to three years of probation.  In 2003, he was arrested for felony driving under the influence in Maricopa County, Arizona, and was subsequently convicted and imprisoned.  In 2007, BRECKER had his civil rights restored for the 1998 felony conviction, and in 2008, he had his civil rights restored for the 2003 felony conviction, including the right to possess a firearm.

**Controlled Delivery #1**

10.      In December 2010, a drug detection dog under the direction of the United States Postal Inspection Service (USPIS) alerted on a package addressed to Shelby Services Inc., 1715 Clarkson Road in Chesterfield, Missouri 63017, with a non-existent return addressee in Corning, California.  The USPIS determined that there was no business named Shelby Services at 1715 Clarkson Road.  That location was occupied by Misty's Spa LLC d.b.a. Tropical Sun Tanning ("Tropical Sun").  According to a registration form filed with the Missouri Secretary of State on

3

June 6, 2010, BRECKER was the Registered Agent and sole organizer of Misty's Spa LLC.[1]

11.     On December 7, 2010, the USPIS attempted a controlled delivery of the package to 1715 Clarkson Road. The sole employee at the business told the undercover postal inspector that the owner, whom he identified as David Brecker, was not there. The employee called BRECKER, who told the employee not to accept the package. The USPIS subsequently opened the package and found it contained approximately 13 pounds and 6 ounces of marijuana. When the employee who declined to accept delivery of the package was subsequently interviewed, he stated he had seen the inspector's concealed handgun and suspected the delivery was a law enforcement operation.

**Controlled Delivery #2**

12.     In September 2012, a drug detection dog under the direction of the USPIS alerted on a package addressed to "Mike" at 488 Parkview Drive in Ellisville, Missouri 63021. Public and law enforcement records showed that BRECKER and his wife Misty lived at this address. On September 5, 2012, an undercover USPIS employee delivered the package to BRECKER at his residence. After BRECKER accepted the package, the team approached him. BRECKER gave consent for the investigative team to search his residence. The team found a total of $45,420 in cash in a safe and five loaded and operable firearms in the residence.

13.     BRECKER waived his rights and agreed to be interviewed. He stated he had obtained the cash in his safe from the sale of marijuana that he had obtained from a female he knew only as Laura who lived near Eureka, California. BRECKER said he was introduced to Laura about five years before by Christopher Pyszka. BRECKER said he had "coordinated" the movement of approximately $4 million worth of marijuana from Laura in California to St. Louis

---

[1]     I believe that BRECKER's wife is named Misty Miller Brecker.

4

during the preceding 18 months (an estimated start date in March 2011). BRECKER said he would have the marijuana that he bought in California mailed to St. Louis. He also said Laura would pay a courier $200 a pound to drive the marijuana from California to St. Louis. BRECKER also said he traveled to California and Colorado to "do business."

      14.     BRECKER identified Christopher Pyszka as one of the people who bought marijuana from him. BRECKER said he gave the marijuana to Pyszka on consignment, and Pyszka would later pay him $4,200 per pound. BRECKER said he would "re-route" packages of marijuana for other people. The others would notify BRECKER that they had packages of marijuana to ship and he would arrange to have the packages delivered to vacant residences or places he did not believe would attract attention. He said he received about $2,000 to $4,000 for each package of marijuana that he "re-routed."

      15.     BRECKER said that in addition to income from his tanning salon, he lived on approximately $3 million that he had in a Charles Schwab trust account that his father established for him when BRECKER's mother and grandmother passed away. BRECKER said he had comingled money he got from selling marijuana with the money in the trust account. BRECKER was arrested; however, the local prosecutor did not file charges against him. As will be described below, in March 2013, BRECKER and his wife moved out from 488 Parkview Drive in Ellisville to the **Target Location**.

**Confidential Source #1**

      16.     In October 2012, the investigative team interviewed a person hereafter referred to as Confidential Source #1 (CS #1). Prior to the interview, the investigative team knew CS #1 was associated with BRECKER and to have a prior arrest for drug trafficking. The information CS #1 provided implicated CS #1 in criminal activity. Much of the information CS #1 provided

has been corroborated by other confidential sources, by law enforcement and public records, and by independent law enforcement investigation. The following is a summary of the information CS #1 provided.

17.    CS #1 stated that BRECKER obtains marijuana on the west coast for distribution in St. Louis. BRECKER travels between the west coast and St. Louis via commercial airlines. BRECKER is a close associate of Kyle Kienstra. BRECKER stores large amounts of cash in a safe at his tanning salon on Clarkson Road in Chesterfield, Missouri. BRECKER takes large amounts of cash in small denominations to St. Louis area casinos. BRECKER, and others acting as his direction, use the small bills to gamble a short time, and then exchange their gaming chips for $100 bills.

**Records of Money Laundering at Casinos**

18.    Records subpoenaed from Hollywood Casino located in Maryland Heights, Missouri show that BRECKER exchanged $20 bills for $100 bills at the casino as follows:

| Date | Amount |
|------|--------|
| October 10, 2011 | $12,000 |
| October 11, 2011 | $12,000 |
| October 26, 2011 | $9,600 |
| Total | $33,600 |

19.    Records subpoenaed from the Ameristar Casino located in St. Charles, Missouri show that on November 10, 2011, BRECKER entered the casino, engaged in gaming for a very short time and then exchanged his casino vouchers for $9,100 in $100 bills.

**Confidential Source #2**

20.    In February 2013, the investigative team interviewed a person hereafter referred to as Confidential Source #2 (CS #2). Prior to the interview, the investigative team knew CS #2 was associated with BRECKER and had prior arrests for drug trafficking and crimes of violence. The information CS #2 provided implicated CS #2 in criminal activity. Much of the information

6

CS #2 provided has been corroborated by other confidential sources, by law enforcement and public records and by independent law enforcement investigation. The following is a summary of the information CS #2 provided.

21.     CS #2 stated that BRECKER has an ownership or managerial interest in a drug and alcohol rehabilitation clinic located on Old Ballas Road in Creve Coeur, Missouri. In early 2012, BRECKER had a large box containing marijuana mailed to the business where BRECKER picked it up from the postal employee. BRECKER took the box to his home, unpacked it and subsequently distributed the marijuana. Before the incident in which the USPIS attempted a controlled delivery of marijuana to his tanning salon (described above as Controlled Delivery #1), BRECKER had packages of marijuana shipped to the tanning salon.

22.     CS #2 further stated that BRECKER has marijuana customers in Jennings, the City of St. Louis and a number of west St. Louis County suburbs. BRECKER charges his customers $4,000-$5,000 per pound of marijuana. BRECKER is often armed with a handgun when he is dealing marijuana. BRECKER uses disposable cellular telephones to contact his drug trafficking associates, and frequently replaces his phones.

**Confidential Source #3**

23.     Beginning in September 2013, the investigative team obtained information from a person hereafter referred to as Confidential Source #3 (CS #3). Prior to the interview, the investigative team knew CS #3 had been involved in the transportation of large amounts of cash drug trafficking proceeds between St. Louis and northern California. The information CS #3 provided implicated CS #3 in criminal activity. Much of the information CS #3 provided has been corroborated by other confidential sources, by law enforcement and public records and by independent law enforcement investigation. The following is a summary of the information

CS #3 provided:

24.     Starting in early 2012, Michael Saracino, a resident of south St. Louis County, hired CS #3 to deliver marijuana to, and pick up cash from, a number of people in the St. Louis area.  Saracino subsequently introduced CS #3 to Kyle Kienstra, who then lived in a condominium in Creve Coeur, Missouri.

25     In early 2013, Saracino was arrested in St. Louis with several pounds of marijuana and a large amount of cash.  After Saracino's arrest, Kienstra told CS #3 to bypass Saracino and deal directly with him for delivering marijuana and picking up cash. Kienstra later directed CS #3 to rent cargo vans and leave them in public parking lots. Kienstra arranged for persons unknown to CS #3 to pick up the vans and place wooden crates of marijuana in them.  At Kienstra's direction, CS #3 unpacked the crates, and delivered the marijuana in quantities that Kienstra specified to persons Kienstra identified.  CS #3 found the marijuana in the crates was packaged in one pound heat sealed plastic bags.  CS #3 estimated that between early 2013 and September 2013, the source delivered between 4,050 and 5,400 pounds of marijuana for Kienstra.  Kienstra and Saracino told CS #3 they were selling the marijuana for $3,000 per pound, meaning the marijuana that the source delivered was worth $12,150,000 to $16,200,000.

26.     In March 2013, Kienstra directed CS #3 to transport cash proceeds from St. Louis to San Francisco via Amtrak.  Kienstra told CS #3 that when he arrived in San Francisco, he should check into a hotel near Fisherman's Wharf and notify Kienstra which hotel he had selected.  Kienstra would then arrange for a person(s) unknown to the source to pick up the cash.

27.     When CS #3's train stopped in Reno, Nevada, law enforcement officers came on the train, approached the source, and asked him questions about his travel.  When the CS #3's

8

answers became evasive and inconsistent, the officers asked for and obtained permission to search the source's luggage. The officers found and seized $60,000 in cash that Kienstra had given CS #3.

28.    Several weeks after the cash was seized from CS #3, Kienstra directed CS #3 to deliver the cash proceeds from marijuana sales to a male Kienstra identified only as Baldy. Kienstra said Baldy lived in California. CS #3 identified a driver's license photograph of BRECKER as the photograph of the person identified to CS #3 as Baldy. Following Kienstra's directions, CS #3 delivered the cash to BRECKER at various hotels in the St. Louis area. On each delivery to a hotel, the source gave BRECKER at least $100,000, and usually about $150,000. On one occasion, the cash totaled slightly more than $300,000. CS #3 estimated he delivered between $1.6 million and $2 million in cash to BRECKER between early 2013 and September 2013. Nobody told CS #3 the organization had other person(s) collecting cash from distributors; however, CS #3 realized the marijuana that CS #3 delivered had to result in significantly more cash proceeds than what he was collecting and delivering to BRECKER. Therefore, CS #3 believed there were other people collecting cash proceeds for the organization.

29.    BRECKER told CS #3 that he transported the cash in his carry-on luggage on commercial airlines. BRECKER showed CS #3 how he placed the cash loose inside business envelopes and wrote doctor's names on the outside. BRECKER told CS #3 he packaged the cash in this manner so that it appeared the envelopes contained confidential medical records, making it illegal for security personnel to open them.

30.    On at least one occasion in mid-2013, Kienstra directed CS#3 to deliver cash to BRECKER at the office building at 711 Old Ballas Road, Creve Coeur, Missouri. CS #3 met BRECKER in the parking lot of the building and gave him a gym bag containing about $20,000

in cash from the sale of marijuana.  When BRECKER put the bag in his SUV, CS# 3 saw him

looking in the vehicle for keys that BRECKER said were for the building, leading CS #3 to

believe BRECKER owned, managed or rented space in the building.

31.     In September 2013, Kienstra took CS #3 to 352 Summit Avenue in San Rafael,

California, the **Target Location**, which Kienstra identified as BRECKER's residence.  At the

residence CS #3 met BRECKER, and observed monitors for security cameras covering the

exterior of the property.  CS #3 stated that Kienstra, BRECKER and their associates use

disposable cellular telephones to contact each other and that they frequently replace their phones.

32.     Kienstra directed CS #3 to pay cash for expenses related to the drug trafficking

operation.  Kienstra also directed CS #3 to use other people to rent vehicles for him and to obtain

alias identifications to use in the drug trafficking operation.

33.     The investigative team and I are aware that marijuana grown outdoors in northern

California is harvested in September and October.  Kienstra told CS #3 that during October to

November, a period Kienstra and his associates referred to "Croptober," the organization slowed

down its marijuana distribution because the competition was so strong from other marijuana

traffickers that the organization could not get its usual price.  CS #3 observed that during the rest

of the year, the organization had a steady supply of marijuana.  Based on these facts, the

investigative team and I believe the organization in which BRECKER is involved obtains

marijuana from both indoor and outdoor grow operations.

**Additional USPIS Investigation**

34.     After the controlled delivery of marijuana to BRECKER's residence in September

2012, the USPIS determined that the following additional packages were shipped from non-

existent shippers in California or Oregon to either Tropical Sun's business address or 711 Old

10

Ballas Road, Creve Coeur, Missouri (both businesses which are controlled by BRECKER).

| Delivery date | Shipped to Address | Package Weight |
|---|---|---|
| 10/23/2010 | Tropical Sun<br>1715 Clarkson Road<br>Chesterfield, Missouri 63017 | 3 pounds<br>15 ounces |
| 11/26/2010 | Chris Sheldon<br>1715 Clarkson Road<br>Chesterfield, Missouri 63017 | 12 pounds<br>8 ounces |
| 8/20/2012 | F & R Solutions<br>711 Old Ballas Road Suite 220<br>Creve Coeur, Missouri 63141 | 28 pounds<br>15 ounces |
| 8/20/2012 | F & R Solutions<br>711 Old Ballas Road Suite 220<br>Creve Coeur, Missouri 63141 | 49 pounds<br>1 ounce |
| 9/4/2012 | F & R Solutions<br>711 Old Ballas Road Suite 220<br>Creve Coeur, Missouri 63141 | 48 pounds<br>10 ounces |

35.     The investigative team has not been able to identify a person named Chris Sheldon or a business named F & R Solutions associated with 711 Old Ballas Road.

36.     Based on the facts the investigative team developed in this investigation, there is reason to believe the packages described above also contained marijuana that BRECKER distributed in the St. Louis area.  Since these deliveries occurred before 2013, this quantity is not included in the 4,050 to 5,400 pounds of marijuana that CS #3 estimated that he personally delivered for the organization.

**Midwest Institute for Addiction LLC**

37.     According to public and law enforcement records, the Midwest Institute for Addiction LLC was created on March 20, 2012.  According to documents filed with the Missouri Secretary of State's Office, David Brecker was one of three organizers of the corporation. According to the corporation's annual report filed with the Missouri Secretary of State's office on July 1, 2013, Mathew Silva is the corporation's president and BRECKER is its secretary and the sole member of its board of directors.  An article in the August 7, 2012 edition of the Creve

11

Coeur Patch that covered the opening of the Midwest Institute for Addiction identified and quoted Silva as the corporation's president.

38.     This business has a website that identifies several staff members, including medical doctors, psychologists, social workers and substance abuse counselors.  The website states the business operates an outpatient clinic at 711 Old Ballas Road and an inpatient clinic at an unidentified location in St. Louis.  The website does not mention BRECKER.

39.     The investigative team has not interviewed any personnel at the Midwest Institute for Addiction because of concern such interviews would jeopardize the ongoing investigation. Using the other investigative techniques available, the investigative team has not been able to determine the exact nature of BRECKER's association with the business.

40.     As described above, CS #2 and CS #3 reported that BRECKER had packages of marijuana and cash proceeds from the sale of marijuana delivered to 711 Old Ballas Road.

**Charles Schwab Accounts**

41.     Records subpoenaed from Charles Schwab (Schwab) show that account number 1801-9982 was opened on December 21, 1992 as a trust account for BRECKER with his father Lawrence Brecker as the custodian.  In 2007, the account was converted to a joint account. Between November 1, 2011 and January 17, 2012, BRECKER made 19 deposits into the account totaling $62,956.  The deposits consisted of 86 money orders totaling $53,356 and seven cashier's checks totaling $9,000.

42.     On June 9, 2010, three days after BRECKER bought a tanning salon in the St. Louis area called "Tropical Sun," he opened a Schwab account for the business, account number 5641-5657.  Between November 3, 2010 and March 19, 2012, BRECKER made 17 deposits into the account totaling $45,455.  The deposits consisted of 45 money orders totaling $35,855 and

four cashier's checks totaling $9,600. The deposit amounts ranged from $360 to $9,700. Most of the money orders were for $1,000, and the cashier's checks ranged from $2,000 to $6,600. On some occasions, BRECKER purchased several money orders and cashier checks on the same or consecutive days.

43.     After Schwab anti money laundering representatives called BRECKER and asked him about the deposits, there were no more similar deposits into either account.

**Chase Checking Account**

44.     On August 22, 2012, Lawrence Brecker and David Brecker opened a joint Chase checking account. Between March 18, 2013 and November 20, 2013, a total of $190,336 in cash was deposited into the account. Several of the cash deposits were made on the same or consecutive day. None of the deposits was $10,000 or more, but several were $9,000.

45.     Between August 24, 2012 and November 19, 2013, a total of $31,781.22 was transferred from the Chase checking account to make payments on BRECKER's joint Chase credit card account described above. The funds for these transfers almost always came from cash deposited into the checking account within a few days preceding the transfers.

**Chase Credit Card Account**

46.     On September 17, 2012, Lawrence Brecker, BRECKER's father, signed and faxed an application to Chase to have his son become a joint account holder on his Chase credit card account, account number 4417-2020-8808-3967. This date was twelve days after the investigative team conducted a controlled delivery of marijuana to BRECKER, searched his home and examined his credit cards. On the application, BRECKER stated he was employed at Tropical Sun and was earning "$50,000+" a month.

47.     After BRECKER became a joint account holder, the activity on the account

changed.  Before the change, the bills were paid once a month with checks written on Lawrence

Brecker's medical clinic in Arizona.  After the change, payments were made several times a

month, often with transfers from BRECKER's joint Chase checking account or with cash

deposited at ATMs.  Before the change, the charges were almost all in Arizona or Colorado, and

were seldom for hotels, airfare or car rentals.  After the change, charges were almost all in

California or St. Louis, and most were for hotels, airfare or car rentals.  The total monthly

charges increased from an average of $12,411 between October 2011 and August 2012 to an

average of $23,816 between September 2012 and December 2013.

48.     Between September 2012 and December 2013, a total of $381,058 was paid on

the account.  Between March 8, 2013 and January 23, 2014, a total of $219,076 in cash was paid

on the account.  Most of the cash payments made after BRECKER moved to California were

made at the Chase branch at 1299 4th Street, San Rafael, California 94901, which is

approximately 2 ½ miles from his residence at the **Target Location**.

49.     Between August 31, 2013 and February 3, 2014, BRECKER's Chase credit card

account was accessed via the internet eight times from a Comcast IP address that is subscribed to

by a Shelly Baker, 352 Summit Avenue, San Rafael, California 94901.  The Comcast monthly

billing statements for the internet service are mailed to Baker at the **Target Location**.  As

described further below, the investigative team and I believe BRECKER uses Shelly Baker for

utility service accounts and as a remitter on checks to conceal his identity or involvement in

financial transactions.  The investigative team and I believe the use of the internet to access

BRECKER's credit card account supports my conclusion in this affidavit and Attachment B that

there will be evidence on computers in the target location.

50.     BRECKER's credit card records show that about once every 3-4 weeks during

14

March through December 2013, he traveled between San Francisco and St. Louis via commercial airlines, including a trip in December 2013.  During those trips to St. Louis, BRECKER had credit card charges at the same hotels where CS #3 says me met with BRECKER to deliver to BRECKER the cash proceeds of marijuana trafficking.

**Lease of 352 Summit Avenue**

51.     Through utility records, credit card charges and other subpoenaed and public records, the investigative team determined that BRECKER and his wife Misty Brecker moved out of their Ellisville, Missouri residence in late March or early April 2013, and moved into the **Target Location** at 352 Summit Avenue, San Rafael, California, on or about April 12, 2013.

52.     According to public sources, the property at 352 Summit Avenue was advertised for rent in 2010 for $4,995 a month through Foundation Rentals and Relocation Inc., a property management company in Marin County.  On April 10, 2013, an $11,990 cashier's check was purchased with funds from BRECKER's Chase checking account and made payable to Foundation Rentals and Relocation Inc.  The remitter was identified as Shelly Baker.  The memo line of the check states the check was for "Security deposit 352 Summit Ave."

53.     On April 10, 2013, a $5,950 cashier's check was purchased with funds from BRECKER's Chase checking account and made payable to Raoul Goff, the owner of the **Target Location**.  The remitter on the check was identified as Shelly Baker.

54.     On or about April 12, 2013, the utilities at the **Target Location** were placed in the name Shelly Baker.

55.     In early 2013, BRECKER changed his mailing address to a mail delivery box rented at a UPS Store in San Rafael, California.

56.     On several occasions in the past two months, and as recently as March 21, 2014,

members of the investigative team observed a gray 2011 Chevrolet Silverado pickup with California license number 89658D1 parked at the **Target Location**. This license number is registered to BRECKER at 352 Summit Avenue. On at least three occasions, including at 8:15 a.m. on March 21, 2014, the pickup was parked at the **Target Location** in the early morning hours, indicating BRECKER had spent the night there. Due to the isolated location of the **Target Location**, and the lack of line of sight locations from which to conduct surveillance of it, the investigative team has not been able to maintain stationary surveillance of the property.

**Shelly Anna Baker**

57.     The investigative team has identified the person known as Shelly Baker who has the utility accounts for the **Target Location** as a 27 year-old white female who is originally from California. Baker has no work history in either California or Missouri, and she has no vehicles registered to her in either state. Based on the results of the investigative team's investigation, we believe Baker does not have a legitimate source of income, and that BRECKER supplied the cash she used at various times during this investigation.

58.     On June 7, 2010, the management of the HH Gregg Appliances and Electronics store, 17397 Chesterfield Airport Road in Chesterfield, Missouri 63017, called the police to report they had found a bag of marijuana that a customer had apparently dropped on the showroom floor. The responding officers found that the store's security video showed that a male and female had entered the store where the male spoke with an employee about his laptop computer. At that point, a bag of marijuana dropped from the female's purse onto the floor. The male and female subsequently left the store before the marijuana was discovered. By comparing the people in the video to the known photographs of BRECKER and Baker, the investigative team has identified the male in the security video as BRECKER and the female as Shelly Baker.

16

59.     In August 2013, members of a local/federal drug task force conducted controlled purchases of marijuana from Joshua Bernstein in St. Louis County, Missouri. Joshua Bernstein is the son of Mark Bernstein, the person who bought the Tropical Sun Tanning salon from BRECKER. During those controlled purchases, Joshua Bernstein stated he was getting the marijuana from the same person who sold the tanning salon to his family.

60.     On September 12, 2013, the local task force executed search warrants on Bernstein's residence and the stash house apartment. The task force seized several pounds of marijuana and $110,125 in cash from the residence.

**Purchase of Property in Zenia, California**

61.     According to subpoenaed, public and law enforcement records, BRECKER purchased a property at 12722 Bluff Creek Road in Zenia, California on July 18, 2013. The purchase price for that property was $505,000. BRECKER made a $370,000 down payment with a wire transfer from his Schwab account 1801-9982. The sellers financed the remaining $135,000. Records subpoenaed from the sellers' accounts show that Shelly Anna Baker deposited two $10,000 cashier's checks and two $6,000 cashier's checks into the sellers' account. Baker purchased the four cashier's checks with cash at a Chase branch in Oakland, California. Between August and December, 2013, BRECKER wired five payments of $2,237.34 each to the sellers' account.

**Auto Loans**

62.     According to subpoenaed, public and law enforcement records, BRECKER applied for an auto loan from JP Morgan Chase on August 20, 2010 to purchase a black Infinity FX45 from Bommarito Infinity in Ellisville, Missouri. On his credit application, BRECKER stated he was the president of West County Tanning, had been for two years, and was earning

17

$35,000 per year. The investigative team was unable to find any record of a business by that name in the St. Louis area.

63. According to public and law enforcement records, on August 16, 2013, BRECKER bought a gray 2011 Chevrolet Silverado pickup from Victory Chevrolet, 1360 Auto Center Drive in Petaluma, California. BRECKER made an $8,000 down payment that consisted of $6,000 in $100 bills and a $2,000 charge on his JP Morgan Chase (Chase) credit card account. BRECKER applied for a loan from Chase to pay the balance of the purchase price. On his credit application, BRECKER stated he was employed as the president of the Midwest Institute for Addiction and was earning $20,000 a month. The vehicle sales contract listed the **Target Location** as BRECKER's home address. On his credit application however, BRECKER listed 5102 South Fern Court in Chandler, Arizona as his home address. He stated that he had lived there for four years and that the **Target Location** was his prior address. Nonetheless, Chase mailed statements to BRECKER at the **Target Location**. The investigative team has determined that the Chandler, Arizona address belongs to Lawrence Brecker, BRECKER's father.

**Lack of Legitimate Income:**

64. According to the Missouri Division of Employment Security, an agency that records the amounts of income and income taxes paid to and by individual employed or residing in Missouri, BRECKER did not receive income in Missouri between January 2012 and the end of September 2013, and Shelly Baker did not receive income from October 2012 to September 2013. According to the California Employment Development Department, neither BRECKER nor Baker has a work history in California. During this investigation, the investigative team has examined numerous financial records, including BRECKER's credit card, checking account and Charles Schwab investment account records. During these examinations, the investigative team

has not found any record that BRECKER deposited or cashed any checks from the Midwest Institute for Addiction.

65.    Pursuant to a court order, a member of the investigative team reviewed transcripts of BRECKER's federal tax returns.  The following is a summary of those transcripts.

Personal Income

| Year | Business Income | Adjusted Gross Income |
|------|-----------------|-----------------------|
| 2007 | -0- | $22,114 |
| 2008 | -0- | $10,282 |
| 2009 | -0- | $8,114 |
| 2010 | negative $14,081 | $7,683 (total income) |
| 2011 | $5,778 | $20,617 |
| 2012 | $27,821 | $110,479 |

Tropical Sun

| Year | Cost of Goods Sold | Total Expenses | Gross Receipts | Adjusted Gross Income |
|------|--------------------|----------------|----------------|-----------------------|
| 2011 | $4,203 | $64,304 | $74,415 | $20,617 |
| 2012 | $23,638 | $83,935 | $135,558 | $110,479 |

66.    BRECKER claimed that from 2011 to 2012, the tanning salon that he purchased for $12,500 in June 2010 had an 82% increase in gross receipts and a 435% increase in adjusted gross income.  As described above, the Tropical Sun business manager who worked for both the previous owner and BRECKER estimated the business was making a profit of about $60,000 in 2010 and 2011.  The former business manager also stated BRECKER purchased new tanning beds and office equipment and had the interior repainted before the business manager left in approximately August 2011.

67.    Subsequent to the search of the Bernstein residence described above, Michael Bernstein's father, Mark Bernstein Sr., told the task force officers that he was helping his sons remodel and operate the tanning salon they had just purchased.  Mark Bernstein Sr. stated that when he met with BRECKER's accountant before his family bought it, he learned the tanning salon was not making a profit.

68.     Based on the tax return transcripts and other information the investigative team and I developed about BRECKER, there is reason to believe BRECKER submitted a fraudulent tax return in 2012, and that he did so to create a seemingly legitimate source of income after the investigative team conducted the controlled delivery of packages of marijuana to his home in September 2012, seized cash from his safe, and obtained his admission that he had been involved in the distribution of $4 million worth of marijuana.  More importantly, BRECKER did not claim any income from or business expenses for the Midwest Institute for Addiction on his 2012 tax return, which was the year the business was created and the year BRECKER was identified on documents filed with the Missouri Secretary of State as the corporation's organizer.

69.     It is my opinion that the information in this affidavit establishes that BRECKER resides at the **Target Location**, that he has been engaged in marijuana trafficking for at least the past four years, and that he has committed financial crimes, including wire fraud, mail fraud and money laundering.

70.     Based upon my experience and training, the experience and training of other members of my investigative team, I know the following:

a.     Persons who deal in a large quantity of marijuana and cash drug proceeds commonly keep records relating to the transporting, purchasing, and distributing of controlled substances, and the laundering of their illegal proceeds at their residences.  Those records include the dates, amounts of drugs and money, and identities of the persons involved.  These records are both electronic and handwritten, and are often created and maintained in code;

b.     Persons who deal in a large quantity of marijuana also keep paraphernalia for packing, cutting, weighing, and distributing the marijuana.  The paraphernalia includes, but is not limited to, scales, plastic bags, and heat sealers;

c.      Drug traffickers who deal in large quantities of marijuana must have large amounts of U.S. currency readily accessible in order pay for drugs and drug trafficking expenses;

d.      Persons who deal with a large quantity of cash keep items useful in counting and packaging it;

e.      Persons who deal in a large quantity of marijuana and cash use safes, storage facilities and electronic surveillance systems to protect the marijuana, the cash and themselves;

f.      Large scale drug traffickers frequently take or cause to be taken photographs or videos of them, their associates, their property and their drugs and frequently maintain these photographs in their residence or other buildings under their control.  It is common for these photographs to be kept indefinitely, even over the course of years.  These photos and videos often are stored in electronic format;

g.      When drug traffickers amass large proceeds from the sale of illegal drugs, they attempt to legitimize their profits.  In order to accomplish these goals, drug traffickers use financial institutions, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.  They maintain records of these transactions in their residence or other buildings under their control well after the drug transactions have been completed;

h.      A residence often will contain evidence identifying the person(s) who own, rent or reside there;

i.      Persons engaged in large scale drug trafficking frequently keep firearms in their residences or other buildings under their control to protect to protect the marijuana, the cash

21

and themselves;

      j.     Drug traffickers store records in computers and electronic memory devices in addition to, or in lieu of, hard copy versions of this data.  Similar to filing cabinets, boxes, or other physical devices for such records and documents, computers, electronic storage media and peripherals are commonplace and are often located inside residences.  Further, documents and records can be "hidden" within such electronic storage media.

71.     BRECKER's credit card records show he accessed the account and made payments on the account via the internet.  He also paid an additional fee for wireless internet access on a number of the times he stayed in hotels.  These facts and the fact BRECKER purchased a laptop computer with internet capability are evidence that BRECKER uses computers to access the internet.  The records on BRECKER's computer will be important evidence of his illegal activity.  There is reason to believe that computers that BRECKER uses will be at the **Target Location**.

72.     Drug traffickers use cellular telephones to communicate with their co-conspirators.  For example, CS #2 and CS #3 reported that BRECKER and his associates use cellular telephones to contact each other.  The cellular telephones BRECKER and his co-conspirators use for such purposes contain information that will be critical to their identification and prosecution.  I ask that if the court issues the requested search warrant, the search warrant include the authority to search any cellular telephones which are found at the location to be searched and which can reasonably be connected to illegal activity.

73.     Permission is requested to search and seize any documents, computers, printers, copiers, and digital storage media (or functionally equivalent digital data storage devices including computer peripherals and data devices), related to any and all drug trafficking activity.

74.     Because it is possible electronically stored data may be searched to seize the information sought in this warrant, a Special Agent with specialized training concerning the search of electronic equipment used to store information will provide assistance during the execution of this warrant to retrieve and preserve electronically stored information.  The Special Agent will have specialized training and experience in computer hardware and software, as well as how computers are used to facilitate the commission of crimes.  Based on that Special Agent's knowledge, training and experience, and my own, I know the following:

a.      Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical or similar computer impulses or data.  Hardware includes any data-processing devices (such as central processing units and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, floppy disks, external hard disks, floppy disk drives and diskettes, tape drives and optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts, that can be used to restrict access to computer hardware (such as physical lock and keys).

b.      Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, optical, or other digital form.  It commonly includes programs to run operating systems, applications, utilities, compilers, interpreters, and communications programs.

c.      Computer-related documentation consists of written, recorded, printed, or

electronically-stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

        d.     Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or programming codes. A password (which is a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

        e.     Computer hardware and computer software may be utilized to store information or data in the form of electronic or magnetic coding on computer media or on media capable of being read by a computer or computer related equipment. This media includes, but is not limited to fixed hard drives and removable hard drive cartridges, laser disks, tapes, floppy disks, CD-ROMs, and any other media capable of storing magnetic coding.

    75.     The forensic examiner will follow the protocol outlined in Exhibit C.

## CONCLUSION

    76.     Based on the facts in this affidavit, I believe there is evidence of money laundering, mail fraud, wire fraud, conspiracy and drug trafficking at 352 Summit Avenue, San Rafael, California 94901.

    77.     In view of the ongoing nature of this investigation, and the risk of harm to agents, and to the investigation which would exist should the information in this affidavit be prematurely

disclosed, I respectfully request that this affidavit and associated records concerning these searches be sealed until further order of the Court.

I declare under penalty of perjury that the foregoing are true and correct to the best of my knowledge.

OWEN CUNNINGHAM
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me on March 24, 2014

HON. NATHANAEL COUSINS
United States Magistrate Judge

25

## ATTACHMENT A

The place to be searched, the **Target Location**, is described as follows:

A single family residence located at 352 Summit Avenue in San Rafael, California, 94901.  The residence is a white, two-story structure on the North side of Summit Avenue.  The front gate is marked by two stone pillars, with the numbers "3 5 2" on one of the pillars.

The **Target Location** includes basements, attics, storage spaces, out buildings, sheds, the surrounding grounds and any containers thereon which could contain any of the items sought.

**ATTACHMENT B**

The property to be seized at 352 Summit Avenue, San Rafael, California 94901, is as follows:

1.  All computers and computer hardware, including data-processing devices (such as central processing unit and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices);  peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical locks and keys);

2.  Computer software, including programs to run operating systems, applications, utilities, compilers, interpreters, video, web browsers, and communications programs, including but not limited to Microsoft Outlook;

3.  All computer-related documentation, including written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items;

4.  All computer passwords and data security devices, including encryption devices, chips, and circuit boards;

5.  Records pertaining to David Brecker's visits to casinos or his use of others to visit casinos on his behalf;

6.  Records pertaining to David Brecker's JP Morgan Chase Bank credit card and checking accounts, his Charles Schwab investment accounts;

7.  Records pertaining to David Brecker's loan for and purchase of a 2006 Infiniti from Bommarito Infiniti on or about August 20, 2010; a loan for and purchase of a 2011 Chevrolet Silverado from Victory Chevrolet on or about August 30, 2013; and his mortgage for and purchase of the property at 12722 Bluff Creek Road, Zenia, California 95595, on or about July 18, 2013.

8.  Records pertaining to Tropical Sun Tanning, Misty's Spa LLC and the Midwest Institute For Addiction, including, but not limited to: books, records, ledgers, journals, receipts, invoices, employee time sheets, client lists, payroll records, billing statements, records of the purchase, renovation, rental or sale of real property, and other papers, records, or documents, opened and/or sealed packages, and/or other mailings and correspondence.

9.  Business records, bank statements, bank deposit tickets, cancelled checks, check registers, deposit tickets, items of deposit, money drafts, letters of credit, wire transfer

records, checking accounts, savings accounts, passbooks, other similar financial statements, loan applications, loan records, payments and purchase records, credit cards, credit card statements, money orders and cashier's checks receipts, traveler's checks, negotiable bearer instruments, records of transfer and/or concealment of assets and the obtaining, secreting transfer, concealment and/or expenditure of money or other things of value.

10. Notes, ledgers, documents or electronic records that may identify the nicknames, names, telephone numbers and other contact information of persons involved in illegal drug transactions, the amounts of drugs and money involved, the amounts that each person owes the supplier and the amounts the supplier owes his/her own supplier.

11. Records of all personal and business expenditures.

12. Cash, checks, credit cards, debit cards, and other monetary instruments related to wire fraud, mail fraud, conspiracy, drug trafficking or money laundering.

13. Assets that may have been purchased with illegal proceeds or funds derived from illegal proceeds of illegal activity.

14. Contracts, car and property rental agreements, letters and all correspondence that are evidence of wire fraud, mail fraud, conspiracy, drug trafficking or money laundering.

15. Cellular telephones and smart phones that may have been used to facilitate the illegal activity described in the affidavit, including but not limited to the call, text message, Twitter and internet search histories on such cellular telephones and smart phones.

16. Cameras, photographs, photograph albums, camera memory cards, video disks, and all other photographic storage media that constitute evidence of wire fraud, mail fraud, conspiracy, drug trafficking or money laundering.

## **ATTACHMENT C**

December 10, 2010

United States District Court for the Northern District of California

### *PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY*

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT THAT
AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT STORES DATA
ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment,
in the Affidavit Supporting the Warrant

1.    In executing this warrant, the government will begin by ascertaining  whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time.  If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2.    If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3.    In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4.    When the government removes a device from the searched premises  it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

5.    When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device,  the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

6.      Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

7.      The time periods set forth in this protocol may be extended by court order for good cause.

8.      In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files. to the extent reasonably practicable.

9.      For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.



AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | **NC** |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) Case No. 3  1 4  7 0 4 3 0 | |
| 352 Summit Avenue in San Rafael, California 94901 | ) | |
| | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:
352 Summit Avenue in San Rafael, California 94901, described more particularly in Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
Evidence, fruits or instrumentalities of violations of 18 U.S.C. 371, 1341, 1343, 1956 and 1957, and 21 U.S.C. 841(a)(1), 846.  The items to be searched for and seized are more fully described in Attachment B incorporated herein by reference.  See attached Affidavit of FBI SA Owen Cunningham and Attachment C incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before      April 7 2014
                                                                                      *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.          ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Hon. Nathanael Cousins                           .
                      *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.
                                                              ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    3/24/2014   2:30pm                 _____
                                                                                      *Judge's signature*

City and state:    San Francisco, CA                         Hon. Nathanael Cousins, U.S. Magistrate Judge
                                                                                      *Printed name and title*

## ATTACHMENT A

The place to be searched, the **Target Location**, is described as follows:

A single family residence located at 352 Summit Avenue in San Rafael, California, 94901. The residence is a white, two-story structure on the North side of Summit Avenue. The front gate is marked by two stone pillars, with the numbers "3 5 2" on one of the pillars.

The **Target Location** includes basements, attics, storage spaces, out buildings, sheds, the surrounding grounds and any containers thereon which could contain any of the items sought.

## ATTACHMENT B

The property to be seized at 352 Summit Avenue, San Rafael, California 94901, is as follows:

1. All computers and computer hardware, including data-processing devices (such as central processing unit and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical locks and keys);

2. Computer software, including programs to run operating systems, applications, utilities, compilers, interpreters, video, web browsers, and communications programs, including but not limited to Microsoft Outlook;

3. All computer-related documentation, including written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items;

4. All computer passwords and data security devices, including encryption devices, chips, and circuit boards;

5. Records pertaining to David Brecker's visits to casinos or his use of others to visit casinos on his behalf;

6. Records pertaining to David Brecker's JP Morgan Chase Bank credit card and checking accounts, his Charles Schwab investment accounts;

7. Records pertaining to David Brecker's loan for and purchase of a 2006 Infiniti from Bommarito Infiniti on or about August 20,2010; a loan for and purchase of a 2011 Chevrolet Silverado from Victory Chevrolet on or about August 30, 2013; and his mortgage for and purchase of the property at 12722 Bluff Creek Road, Zenia, California 95595, on or about July 18, 2013.

8. Records pertaining to Tropical Sun Tanning, Misty's Spa LLC and the Midwest Institute For Addiction, including, but not limited to: books, records, ledgers, journals, receipts, invoices, employee time sheets, client lists, payroll records, billing statements, records of the purchase, renovation, rental or sale of real property, and other papers, records, or documents, opened and/or sealed packages, and/or other mailings and correspondence.

9. Business records, bank statements, bank deposit tickets, cancelled checks, check registers, deposit tickets, items of deposit, money drafts, letters of credit, wire transfer

records, checking accounts, savings accounts, passbooks, other similar financial statements, loan applications, loan records, payments and purchase records, credit cards, credit card statements, money orders and cashier's checks receipts, traveler's checks, negotiable bearer instruments, records of transfer and/or concealment of assets and the obtaining, secreting transfer, concealment and/or expenditure of money or other things of value.

10. Notes, ledgers, documents or electronic records that may identify the nicknames, names, telephone numbers and other contact information of persons involved in illegal drug transactions, the amounts of drugs and money involved, the amounts that each person owes the supplier and the amounts the supplier owes his/her own supplier.

11. Records of all personal and business expenditures.

12. Cash, checks, credit cards, debit cards, and other monetary instruments related to wire fraud, mail fraud, conspiracy, drug trafficking or money laundering.

13. Assets that may have been purchased with illegal proceeds or funds derived from illegal proceeds of illegal activity.

14. Contracts, car and property rental agreements, letters and all correspondence that are evidence of wire fraud, mail fraud, conspiracy, drug trafficking or money laundering.

15. Cellular telephones and smart phones that may have been used to facilitate the illegal activity described in the affidavit, including but not limited to the call, text message, Twitter and internet search histories on such cellular telephones and smart phones.

16. Cameras, photographs, photograph albums, camera memory cards, video disks, and all other photographic storage media that constitute evidence of wire fraud, mail fraud, conspiracy, drug trafficking or money laundering.

**ATTACHMENT C**

December 10, 2010

United States District Court for the Northern District of California

***PROTOCOL FOR SEARCHING DEVICES OR MEDIA
THAT STORE DATA ELECTRONICALLY***

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT THAT
AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT STORES DATA
ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment,
in the Affidavit Supporting the Warrant

1.    In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time. If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2.    If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3.    In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4.    When the government removes a device from the searched premises it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

5.    When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

29

6.      Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

7.      The time periods set forth in this protocol may be extended by court order for good cause.

8.      In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files. to the extent reasonably practicable.

9.      For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.