THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:14CR250 CDP (TIA) |
| | ) | |
| DAVID BRECKER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(B).  Defendant David Brecker moves to suppress evidence recovered during a search conducted pursuant to a search warrant issued on March 24, 2014, and the Government has responded to that motion.  An evidentiary hearing was held on March 11, 2015, and continued on March 16, 2015.  Based upon the evidence adduced at the hearing on the suppression motion, the undersigned makes the following findings of fact and conclusions of law:

I. **FINDINGS OF FACT**

On March 24, 2014, Agent Owen Cunningham of the Federal Bureau of Investigation (FBI) applied for a warrant to search 352 Summitt Avenue in San Rafael, Marin County, California, the house identified by Confidential Source #3 (CS#3) as David Brecker's home.  The affidavit sworn to by Agent Cunningham was some thirty pages in length, and contains a detailed summary of the investigation of Kienstra, Brecker and others in regard to marijuana trafficking, money laundering and the hiding of assets.  Based on the affidavit, United States Magistrate Judge Nathaniel Cousin

of the Northern District of California issued a warrant to search the address and seize certain items. The affidavit sworn to by Agent Cunningham states in pertinent part as follows:

In December of 2010, a controlled delivery of marijuana was made by the United States Postal Inspector to 1715 Clarkson Road in St. Louis County, Missouri, the premises of Tropical Sun Tan Salon, a business owned by David Brecker. When the Postal Inspector masquerading as a postal mail carrier attempted to deliver the package of marijuana, an employee of Brecker's declined delivery of the package. He did this after talking to Brecker on the phone and determining that they believed the postman was really a law enforcement officer. After this, Defendant began mailing marijuana to various other locations including his home address.

On September 5, 2012, Postal Inspector John Jackman discovered what he believed to be two packages of marijuana addressed to the Defendant at his home address of 448 Parkview in Ellisville, Missouri. After learning that the Defendant has asked the regular postman why the package had not yet arrived Inspector Jackman decided to attempt another controlled delivery. The controlled delivery was completed successfully on September 5, 2012, and after the delivery Defendant was arrested.

At that time Defendant gave written consent for Inspector Jackman to search the package and his house. Defendant said he believed the package contained shoes but upon opening the package Inspector Jackman discovered forty-eight pounds of marijuana. During the search of the house Inspector Jackman seized firearms including multiple semi-automatic pistols and a high powered rifle. The Defendant opened a combination safe and the agents discovered $45,000.00 in cash inside of the safe. Agent Cunningham stated in the affidavit that the $45,000.00 represented the proceeds of marijuana sales, but Defendant told Postal Inspector Jackman that the proceeds

were actually from the tanning salon. Not in dispute, however, is the fact that the $45,000.00 was in the safe and was in cash.

After being advised of his rights after the arrest Defendant admitted that his source of marijuana was a person named "Laura" who lived near Eureka, California. He did not know Laura's last name. The Defendant also said that Chris Psyzcka was one of his customers and that Defendant received two to four thousand dollars for marijuana that he re-routed to various people. Defendant said that he had three million dollars in a Charles Schwab account that had been set up for him by his father and acknowledged that he had co-mingled drug money in that account.

The FBI also had developed three confidential sources. Information obtained from each of these sources was corroborated by the others and by documentary evidence. Taken together, the information from those sources based upon their personal knowledge indicated that Defendant was involved in a large marijuana trafficking conspiracy with Kienstra and others and that Defendant had received marijuana at the tanning salon on Clarkson Road, but stopped doing so after an attempted controlled delivery was made at that address. The informants further said that the Defendant had a managing interest in a drug rehabilitation facility in Creve Coeur, Missouri on Old Ballas Road. This information was corroborated by both public record and Defendant's own admission. Informants said that Defendant Brecker would have marijuana sent to this address which he then took to his house to distribute to his customers. CS#3 delivered cash to Defendant Brecker which were the proceeds from marijuana sales at this location. CS#3 worked closely and at the direction of Kyle Kienstra. In this regard, CS#3 delivered approximately four to five thousand pounds of marijuana from January to September of 2013, at the direction of Kyle Kienstra and others. Kienstra also told him to collect cash from various customers and deliver the cash to "Baldy." "Baldy" was identified by the CS as David Brecker.

Information from CS#3 as well as airline and credit card records shows that Defendant traveled from California to St. Louis, Missouri and checked in at various different hotels. The CS then delivered cash to him on several occasions. The cash delivered totaled close to two million dollars over a six month period in 2013. During these occasions Defendant explained to this CS how he was able to travel by plane without having the cash detected. As stated above, at one time, the source delivered the cash to Defendant at his rehabilitation facility in Creve Coeur, Missouri. Credit card, airplane, and motel records corroborated the CS's information indicating that Brecker traveled to St. Louis, Missouri, stayed at certain hotels and met with the CS on certain dates.

In September of 2013, Kienstra took the CS to Defendant's home at 352 Summit in San Rafael, California. The CS met Defendant at this home, and observed that there was a great deal of surveillance equipment on the outside of the home. Further, he said that Brecker and Kienstra used numerous disposable telephones and also frequently change cellular telephones often in order to make it difficult to trace or wiretap their phones. Kienstra and CS#3 visited Brecker's home during September which is marijuana harvesting season. Kienstra and the others referred to it as "Croptober" and held back marijuana at this time so that they would get a better price later when it was less abundant.

The affidavit also states that the Defendant had a Schwab investment account, a Chase Bank checking account and a Chase credit card, most of which were joint accounts with his father. All of the accounts showed multiple cash or money order transactions in amounts and at intervals indicative of money laundering. For instance, from March to November, 2013, the Defendant deposited $190,000 in cash into his Chase checking account. None of the amounts deposited were in excess of $10,000 and many were on consecutive days. Cash deposited into the checking account were used to pay the balance due on the Defendant's Chase credit card. The Schwab

account, showed deposits for the period from November, 2011 to January, 2012, in the amount of $62,956.  These deposits consisted of 86 money orders which totaled $53, 000 and 7 cashier's checks totaling $9,000.  It should be noted that the affidavit states that records from Comcast Cable show that Defendant's Chase accounts were accessed from an internet address located at 352 Summitt, San Rafael, California.

Further, public records and other records show that Defendant moved out of his Ellisville, Missouri house in April of 2013, and also moved into the San Rafael house in April of 2013.  The affidavit also states that a person named Shelly Baker was used by the Defendant to lease the home on Summitt Avenue in her name and to place other assets such as the cable TV, internet account and public utilities in her name in order to conceal Defendant's connection to the house.  For instance, the cashier's check for the deposit on 352 Summitt Avenue was purchased with funds from Defendant's checking account.  However, the remitter on the check was Shelly Baker.  Likewise, the FBI investigation revealed that Shelly Baker was an associate of Defendant's and was identified in a surveillance video as being with him in 2010, while she was in possession of a bag of marijuana.

The affidavit also refers to records which show that in April, 2013, Brecker purchased a gray, 2011 Silverado truck and listed 352 Summitt Avenue as his home address on the sales contract.  He placed his father's address in Phoenix, Arizona on the credit application.  Chase mailed the statements on the loan to 352 Summitt Avenue in San Rafael, California.  The affidavit also lays out evidence to show that Defendant filed a false income tax return for 2012 in an attempt to show a legitimate source of income after the seizure of the marijuana from him in September, 2012.

The affidavit also reflects that surveillance by the FBI and other law enforcement officers of the 352 Summit Avenue residence revealed that Brecker's truck was often parked on the premises and in fact was parked on the premises all night two days prior to the search warrant being executed.

The affidavit further states that when taken together the information contained in the entire affidavit showed that Brecker was involved in a large marijuana dealing operation and had been for at least the past four years.  On the basis of Agent Cunningham's experience and training, the affidavit also states that persons who deal in large quantities of marijuana, and money laundering keep records, computers, assets, evidence of money laundering, tax evasion and other records at their home.  The affidavit shows that these items likely exist in the home because: 1) Chase Bank mailed items to Defendant at the home and 2) because Defendant's checking account was accessed through the internet address registered to the home.  On the basis of their prior experience and expertise, the agents have found that marijuana dealers keep firearms, large amounts of ammunition, cash and combination safe's on their premises and often have sophisticated surveillance equipment and numerous cell phones so they can frequently switch and dispose of the cell phones.  Informants in this case detailed all of the above, and the prior search of the residence in Ellisville, Missouri, showed that the Defendant kept cash in a safe at the residence regardless of where the cash came from.

Based on the above, the United States Magistrate Judge in Northern California issued a warrant to search the premises and to seize certain records and contraband specifically quoted and limited in the warrant.

**II.    DEFENDANT'S ARGUMENTS**

Defendant asserts 1) that the information contained in the affidavit fails to establish probable cause for the search; 2) that the information in the affidavit was stale; 3) that the information provided by confidential human sources was unreliable; 4) that the affidavit contains an intentionally or recklessly false statement; and 5) that the good faith exception to application of the exclusionary rule is inapplicable here.

**III.    ANALYSIS**

*A.  Probable Cause*

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. For a search warrant to be valid, it must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found at the place to be searched. *Johnson v. United States*, 333 U.S. 10 (1948); *Warden v. Hayden*, 387 U.S. 294 (1967). The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . .

*Brinegar v. United States*, 338 U.S. 160, 175 (1949).

"Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir.2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

7

Courts use a "totality of the circumstances test ... to determine whether probable cause exists." *United States v. Hager*, 710 F.3d 830, 836 (8th Cir.2013) (citation omitted).

"In ruling on a motion to suppress, probable cause is determined on the basis of 'the information before the issuing judicial officer.'" *United States v. Smith*, 581 F.3d 692, 694 (8th Cir.2009) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir.1986)). And the sufficiency of a search warrant affidavit is examined using "common sense and not a hyper technical approach." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir.2007) (citation and internal quotations omitted). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Wiley*, No. 09–CR–239 (JRT/FLN), 2009 WL 5033956, at *2 (D.Minn. Dec. 15, 2009) (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir.2005)). In addition, the issuing court's "'determination of probable cause should be paid great deference by reviewing courts.'" *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969) (explaining that "the duty of a reviewing court is simply to ensure that the issuing court had a substantial basis for ... [concluding]' that probable cause existed." *Id*. at 238–39 (internal quotation omitted).

Probable cause to support a warrant may be found even in the absence of direct evidence that drugs or other contraband, such as money, are stored at a defendant's home. Courts uphold such warrants on the basis of inferences drawn from the facts in such cases, as well as the informed opinions and experiences of experienced drug agents in these matters. *See United States v. Grossman*, 400 F.3d 212 (4th Cir. 2005). In *Grossman*, although there was no direct evidence that drugs were stored in the defendant's house, the court reasoned that there was probable cause to search the home for drug evidence, stating that a sufficient nexus can exist between a defendant's

criminal conduct and his residence even when the affidavit supporting the warrant "contains no factual assertions directly linking the items sought to the defendant's residence." 400 F.3d at 218; *see also United States v. Williams*, 974 F3d 480,481(4th Cir. 1992) (upholding a warrant to search hotel room in which the affidavit established (1) that the defendant had a criminal history involving drug trafficking, (2) that his car contained drug residue and a concealed knife, and (3) that he was carrying a receipt for a motel room. *Williams*, 974 F3d at 481. Similarly, in *United States v. Burton*, 288 F.3d 91, 103 (3rd Cir. 2002), the court held that direct evidence of drug-dealing activity was not needed in order to authorize a search warrant, stating: "probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested." In holding that the affidavit was sufficient, the court took cognizance of the agent's expertise in deducing from facts known to him whether or not a particular location involved a "stash house" in which drugs and large amounts of currency might be kept. *Id*.

    Having reviewed the affidavit and the evidence adduced at the hearing in light of the preceding legal principles, the undersigned concludes that the affidavit established probable cause for the search of the premises at 352 Summit in San Rafael, Marin County, California.

    The affidavit indicates that Agent Cunningham and his team conducted a lengthy and thorough investigation relating to Defendant's activities. They gathered evidence from a variety of sources and thereby verified and corroborated the information they discovered. The affidavit contained information obtained through controlled deliveries, confidential human sources, the use of computer, law enforcement, financial and other public records, and an interview with the Defendant.

The results of the investigation support a determination that at the time of the warrant application Defendant had been trafficking in marijuana, laundering the proceeds, and was residing at 352 Summit.  Given the totality of the facts contained in the affidavit, Magistrate Judge Cousins correctly concluded there were sufficient facts to make a practical and common sense determination that there was a "fair probability" that evidence, fruits, and instrumentalities of Brecker's criminal activity would be found at 352 Summit.

As in *United States v. Burton*, the affidavit in this case states on the basis of the experience, training and expertise of Agent Cunningham and other members of the investigating team that persons who deal in large quantities of marijuana and engage in money laundering often keep records, computers, assets and evidence of money laundering and tax evasion in their homes.  In support of the likelihood that these items would be found in 352 Summitt residence, the affidavit includes information that Defendant's bank mailed items to him at that address and Defendant accessed his checking account through the internet address registered to the home.  In addition, on the basis of their prior experience and expertise, the agents have found that marijuana dealers often keep firearms, large amounts of ammunition, cash and combination safes where they reside and often have sophisticated surveillance equipment and numerous cell phones so they can frequently switch and dispose of the cell phones.  The knowledge of Agent Cunningham and other members of the investigating team in this regard which arises from their extensive experience and expertise interviewing defendants, witnesses, informants and others who have experience in gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics trafficking supports the magistrate judge's conclusion that drugs, drug paraphernalia, firearms records and cash and documents were likely to be found in Defendant's residence at 352 Summit.

The issuing magistrate was entitled to rely upon Cunningham's expertise and then and the reasonable conclusions he drew from the results of the investigation. *See United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (holding that experienced police officers "may draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous."); *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007) (explaining that "we have found probable cause to exist in cases in which officers have stated that in their experience such an inference [that evidence of records, paraphernalia, and other evidence of drug trafficking exists at the trafficker's residence] is appropriate and in which a supporting affidavit also described a defendant's continuous course of drug trafficking activity"). As a matter of common sense, it is logical to infer that people in possession of valuable contraband would store that contraband in a safe, accessible location such as his or her residence. *See United States v. Carpenter*, 341 F.3d 666, 670-673 (8th Cir. 2003).

B. *The Facts in the Affidavit Were Not Stale*

Defendant next asserts that because the facts in affidavit were stale the affidavit failed to provide probable cause for the issuance of the warrant.

"In determining whether probable cause dissipated over time, a court must evaluate the nature of the criminal activity and the kind of property for which authorization to search is sought." *United States v. Simpkins*, 914 F.2d 1054, 1059 (8th Cir.1990) (internal quotation omitted). "[T]here is no bright-line test for determining when information is stale . . ." *United States v. Jeanetta*, 533 F.3d 651, 655 (8th Cir. 2008). "Time factors must be examined in the context of a specific case and the nature of the crime under investigation." *United States v. Morrison*, 594 F.3d 626, 631(8th Cir. 2009) (quoting *United States v. Caswell*, 436 F.3d 894, 898 (8th Cir. 2006)). "[W]here criminal activity is suspected, the passage of time is less significant." *Morrison*, 594

F.3d at 631 (quoting *Jeanetta*, 533 F.3d at 655). "In investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant does not necessarily make the information stale." *Id*.

The Court is satisfied that the affidavit describes a drug trafficking organization that began operating at least as early as 2010 and that there was no indication from the information included in the affidavit that the organization had ceased operating at the time of the request for the search warrant. *Williams*, 10 F.3d at 595 (8th Cir. 1993) (observing that "the continuing and ongoing nature of [drug] trafficking supports the continued existence of probable cause"). Although Defendant had moved his residence from St. Louis to California this move in no way indicated that the operation had ceased because the drug trafficking here consistently involved the transport of drugs from California to St. Louis. *Id*. (holding that it was "reasonable for law enforcement officers to conclude that large-scale drug operations continued at the same location for a period of time") (internal citation omitted). The affidavit contains both historical and contemporaneous facts that described a long running criminal enterprise with connections in St. Louis and California, specifically at 352 Summit in San Rafael.

In addition, the affidavit includes information received as late as February 2014, approximately one month prior to the request for search warrant. *Morrison*, 594 F.3d at 631 (explaining that "[i]n investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant does not necessarily make the information stale"). This information indicated that the drug trafficking operation was still ongoing and its command center was 352 Summit Avenue. Further, spot checks conducted by investigators approximately three days prior to the warrant application, as well as bills and other

12

records collected by investigators during this same time period strongly suggested that Defendant resided at 352 Summit at the time the agents applied for the warrant.

For these reasons, the Court rejects Defendant's assertion that the affidavit contained stale information and therefore failed to establish probable cause for the search.

C. *The information provided by the confidential sources was reliable*

Defendant also claims that information provided by the confidential sources was unreliable and thus not a valid basis for finding probable cause. The undersigned does not agree.

Here the investigators not only obtained information from the confidential human sources but also verified that information using other sources, such as public and subpoenaed records. "When an informant's reliability is at least partly corroborated, attacks upon credibility and reliability are not crucial to the finding of probable cause." *Morrison*, 594 F.3d at 632 (internal quotation omitted). For example, CS #3 stated he met and Defendant at his home which he said was located at 352 Summit Avenue. Investigators independently corroborated that information when they observed Brecker's car in the driveway, identified rent payments for the residence that originated from accounts controlled by Brecker, and obtained records associating the payment of utilities at residence with Brecker's known associate Shelly Baker. *See id.* (finding that the fact that the law enforcement officer was able to confirm that the residence identified by the informant was in fact owned by the defendant acted as an independent corroboration of the informant's information). Investigators also corroborated the information provided by CS #3 that he delivered about $2, 000,000 in cash to Defendant on various, specified dates and at various, specified motel locations. In addition, credit card, airplane and motel records corroborated the information

13

provided by CS#3 indicating that Defendant traveled from Saint Louis to California, stayed at certain motels and met with CS#3 on certain specified dates.

On the basis of the foregoing and the general discussion of probable cause set forth above, the undersigned concludes that the information obtained from confidential human sources and included in the affidavit was sufficiently corroborated to support a finding of probable cause.

   D. *Reckless or Intentional Misrepresentation*

Defendant next argues that the affidavit contains a knowing or reckless misrepresentation of fact.  Specifically, Defendant asserts that Agent Cunningham lied when he stated that after the controlled delivery in 2012, Defendant admitted that the money found in his safe was the proceeds of marijuana trafficking.  In support, Defendant contends that the funds were derived from his trust account and tanning business and in support cites a summary police report authored by Detective McKinney where McKinney states that Defendant identified those sources for the funds.

The Government asserts and the undersigned concurs that the affidavit can be reconciled with Detective McKinney's statements in the summary police report.  Moreover, the undersigned is satisfied that even if Agent Cunningham's statement regarding the source of the funds was false and stricken from the affidavit the remainder of the affidavit supports a finding of that there was probable cause for the search.

"'[A] facially sufficient affidavit [in support of a search warrant] may be challenged on the ground that in order to establish probable cause the officer included deliberately or recklessly false statements.'"  *Hawkins v. Gage Cnty*, 759 F.3d 951, 958 (8th Cir.2104) (quoting *United States v. Smith*, 581 F.3d 692, 695 (8th Cir.2009)).  To void a search warrant on the ground that the affidavit includes a false statement, a defendant must show by a preponderance of evidence that (1) the

affiant included in the warrant affidavit "a false statement knowingly and intentionally, or with reckless disregard for the truth," and (2) "the affidavit's remaining content is insufficient to establish probable cause."  *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *see also United States v. Finley*, 612 F.3d 998, 1003 n. 8 (8th Cir.2010); *United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir.2009).  If, after the evidentiary hearing, the defendant establishes by a preponderance of evidence that the affiant intentionally or recklessly included a false statement in the affidavit and the remaining content of the affidavit is insufficient to establish probable cause, the search warrant is considered void and the fruits of the search must be excluded.  *Id*. at 156.

Upon consideration of the affidavit, the police report and the parties' arguments the undersigned concludes that Defendant has not demonstrated by a preponderance of the evidence that Agent Cunningham made an intentional or reckless misstatement when he stated in the affidavit that Defendant had admitted that the money found in his safe was proceeds of marijuana trafficking.

The summary police report reflects that in 2012 when Defendant was removed from the Ballwin residence he was given a receipt for the funds seized and he stated that the funds came from his trust account and the tanning business.  However, Detective McKinney's unredacted report reflects that later that day after Defendant had received full *Miranda* warnings, Defendant explained, during an interview conducted in the presence of Agent Cunningham, that he received marijuana from "Laura" and coordinated the delivery and purchase of approximately $4 million dollars' worth of marijuana between buyers and "Laura."  *See* Doc. No. 351-2 (Unredacted Report).  Although the unredacted report does not include a specific statement by Defendant regarding the source of the funds in his safe, it includes Defendant's admission that he comingled

15

trust account funds and the proceeds from his marijuana dealings. In addition, the unredacted report also states that a drug dog alerted to the currency taken from the safe indicating the odor of marijuana on the money. *Id.* Finally, it is undisputed that both the affidavit and the police report include the Defendant's material admission that he distributed approximately $4 million worth of high grade marijuana in the St. Louis area.

Comparing the reports and the affidavit, the undersigned concludes that the unredacted report corroborates Cunningham's assertion that Defendant obtained marijuana from "Laura" and supports the notion that Defendant's role was to receive the proceeds from the sale of "Laura's" marijuana. The report is silent regarding Defendant's attribution in the interview of the source of funds in the safe.

At most Defendant has shown that Agent Cunningham offered in his affidavit a fact not included in a summary report written by another investigator that was nonetheless consistent with the unredacted version of that report. This, without more, does not show by a preponderance of the evidence that Cunningham's statement in the affidavit "was made deliberately or with reckless disregard for the truth." *United States v. Lee*, 743 F.2d 1240, 1247 (8th Cir. 1984).

Moreover, even if the undersigned were to presume that Agent Cunningham's statement regarding the source of the funds was a reckless or intentional misrepresentation, such a misrepresentation would not invalidate the warrant. The affidavit, without the disputed statement, contains sufficient information to establish probable cause for the search. *See Lee*, at 1247 (noting that "[e]ven where the defendant's allegation of perjury or reckless disregard for the truth is established by a preponderance of the evidence, the search warrant is invalid and the fruits of the search excluded only if, with the affidavits' false material set to one side, the affidavits' remaining

material is insufficient to establish probable cause") (citing *United States v. House*, 604 F.2d 1135 (8th Cir. 1979), cert. denied, 445 U.S. 931 (1980)).

Here, even if Defendant could show that Agent Cunningham deliberately falsified information about the source of the money in the safe and that assertion were stricken from the affidavit, the controlled deliveries, corroborated information provided by the three separate confidential sources, and the extensive financial and other records included in the affidavit are more than sufficient to establish probable cause for the search warrant.

D. *Good Faith*

As set forth above, the undersigned concludes that there was probable cause for issuance of the search warrant. In the alternative, the undersigned concludes that even if the affidavit were lacking in probable cause the good faith exception to the exclusionary rule would apply here to prevent the suppression of evidence discovered during the search.

It is well established that where agents rely in good faith on a warrant to conduct a search and seize evidence, even if the warrant is later shown to be defective, the recovered evidence will not be suppressed. *See United States v. Leon*, 468 U.S. 897, 920-921 (1984). Nonetheless, the Supreme Court has identified certain limited situations in which good faith reliance on a warrant will not justify suspension of the "extreme sanction of exclusion." *Id.* at 916. Those limited situations are in which: (1) the judge was misled by false information in the affidavit that the affiant knew or should have known was false; (2) the issuing magistrate wholly abandoned his judicial role and did not serve as a neutral and detached actor, but was rather a rubber stamp for the police; (3) where a warrant is based on an affidavit so lacking in the indicia of probable cause as to render official belief in its existence entirely unreasonable, and (4) there are infirmities in the

17

warrant itself rather than the affidavit. *See United States v. Carpenter*, 341 F.3d 666, 670-673 (8th Cir. 2003).

Defendant has not demonstrated and the undersigned cannot conclude that any of those exceptional situations are present here.

With respect to the first scenario, to the extent that Defendant asserts that the affidavit contained a misrepresentation that misled the issuing magistrate, the undersigned rejects that argument in light of the determinations set forth above. First, the undersigned found that Defendant failed to demonstrate a misrepresentation here. The issuing magistrate could not have been not misled because the affidavit contained no misrepresentation. And even if the affidavit were deemed to contain a misrepresentation, the undersigned is satisfied, as more fully explained above, that the disputed statement was neither sufficiently material nor significant so as to mislead the issuing magistrate regarding the existence of probable cause.

With respect to the second and third scenarios, the record simply does not support a determination either that the issuing magistrate abandoned his role as arbiter of probable cause or that no reasonable person could have found that probable cause existed here. There is simply no indication here that the issuing magistrate failed to make a detached, neutral probable cause determination, and Defendant has not shown that this is a case where a bare-bones affidavit was rubber-stamped by the issuing magistrate. Moreover, the undersigned concludes that the affidavit does support a finding of probable cause, and, at any rate, that there was nothing in the affidavit that would render an reliance on the warrant entirely unreasonable.

For these reasons the undersigned rejects Defendant's contention that the good faith exception set forth in *Leon* would not be applicable here.

IV.     **CONCLUSION**

On the basis of the foregoing,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained from the Search and Seizure of His Home (Doc. No. 334) should be **denied**.  The parties are advised that they have fourteen (14) days, in which to file written objections to this recommendation and determination.  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir.1990).

Dated this  6th  Day of April, 2015.

*/s/ Terry  I. Adelman*
UNITED STATES MAGISTRATE JUDGE